# Exhibit E

 Outlook

# RE: Revised note

From Matthew Agnone <matthew.agnone@caidanllc.com>
Date  Fri 11/21/2025 2:14 PM
To    Robert Morehardt <rmbtool@hotmail.com>

I just read it and Mike Stines is reviewing. I also just finally got final comments back from Corporate attorney on CIC documents. Very small edits, I sent those to the attorney we used to draft it. so I think we are there just need to get those changes done and have a Docusign sent around.

Matt Agnone
CFO/CIO
Caidan LLC

**From:** Robert Morehardt <rmbtool@hotmail.com>
**Sent:** Thursday, November 20, 2025 4:19 PM
**To:** Matthew Agnone <matthew.agnone@caidanllc.com>
**Subject:** Revised note

Matt

Please review.

Thanks

Sent from my iPhone

## CHANGE IN CONTROL AGREEMENT

This Agreement is made by and between Sharrow Engineering, Inc. and Robert Morehardt.

## SECTION 1
## RECITALS

**1.1** **Summary.** The Company desires to offer to the Employee the payments described in this Agreement as an inducement to the Employee to continue to perform services for the Company or Related Entities through a Change in Control event.

**1.2** **Purpose.** The purpose of this Agreement is to provide a means through which the Company and its Related Entities may retain the Employee, upon whom the responsibilities of the successful administration and management of the Company or its Related Entities rest and whose present and potential contribution to the welfare of the Company and its Related Entities are of importance. This Agreement is intended to provide a means by which the Employee can participate in the economic success of the Company and its Related Entities thereby strengthening the Employee's commitment to the Company and its Related Entities.

## SECTION 2
## DEFINITIONS

**2.1** **Defined Terms.** As used in this Agreement, the following terms shall have the following meanings.

(a) **Agreement** shall refer to this Change in Control Agreement, and any amendment.

(b) **Change in Control** shall mean a change in the ownership as defined below.

(1) A change in the ownership of the Company shall occur on the date that any one person, or more than one person acting as a group, acquires ownership of stock in the Company that, together with stock held by such person or group, constitutes more than eighty percent (80%) of the total fair market value or total voting power of the stock of the Company. If any one person, or more than one person acting as a group, is considered to own more than eighty percent (80%) of the total fair market value or total voting power of the stock of the Company, the acquisition of additional stock by the same person or persons is not considered to cause a change in the ownership of the Company. An increase in the percentage of stock owned by any one person, or persons acting as a group, as a result of a transaction in which the Company acquires its stock in exchange for property will be treated as a change in control for purposes of this subsection.

1

(2) A change in the ownership of a substantial portion of the Company's assets occurs on the date that any one person, or more than one person acting as a group, acquires (or has acquired during the twelve (12) month period ending on the date of the most recent acquisition by such person or persons) assets from the Company that have a total gross fair market value equal to or more than eighty percent (80%) of the total gross fair market value of all of the assets of the Company immediately before such acquisition or acquisitions.

(i) There shall be no change in ownership of a substantial portion of the Company's assets, as described in this subsection, when there is a transfer to an entity that is controlled by the shareholders of the Company immediately after the transfer. A transfer of assets by the Company is not treated as a change in the ownership of such assets if the assets are transferred to:

(A) a shareholder of the Company (immediately before the asset transfer) in exchange for or with respect to its stock;

(B) an entity, fifty percent (50%) or more of the total value or voting power of which is owned, directly or indirectly, by the Company;

(C) a person, or more than one person acting as a group, that owns, directly or indirectly, fifty percent (50%) or more of the total value or voting power of all of the outstanding stock of the Company, or

(D) an entity, at least fifty percent (50%) of the total value or power of which is owned, directly or indirectly, by a person described in Section 2.1(b)(2)(i)(C).

(ii) For purposes of Section 2.1(b)(2) and except as otherwise provided in Section 2.1(b)(2)(i)(A), a person's status is determined immediately after the transfer of the assets.

(3) For purposes of this subsection the following shall apply.

(i) Persons will be considered to be acting as a group as that term is defined in Treas. Reg. §1.409A-3(i)(5)(v)(B).

(ii) The ownership attribution rules of Treas. Reg. §1.409A-3(i)(5)(iii) shall apply in determining ownership.

(iii) Gross fair market value means the assets of the Company, or the value of the assets being disposed of, determined without regard to any liabilities associated with such assets.

(iv) The rules described in Treas. Reg. §1.409A-3(i)(5)(ii) related to the identification of the relevant entity for purposes of determining whether a change in control has occurred shall apply.

(c) **Code** shall refer to the Internal Revenue Code of 1986, as amended.

(d) **Company** shall refer to Sharrow Engineering, Inc., a Delaware corporation, its successors and assigns.

(e) **Effective Date** shall mean November 1, 2025.

(f) **Employee** shall refer to Robert Morehardt, his personal representative, heirs, successors and assigns.

(g) **ERISA** shall refer to the Employee Retirement Income Security Act of 1974, as amended.

(h) **Gross Proceeds** means the total proceeds and other consideration paid or received or to be paid or received, directly or indirectly, in connection with the Change in Control transaction, including but not limited to cash, notes, securities, contingent payments, whether or not held in escrow, and earn outs. If the Gross Proceeds includes property other than cash, the value of such property will be determined using the methodology set forth in the definitive agreement(s) related to the Change in Control transaction or, if not so established, at the present value of the property on the closing date of the Change of Control Transaction, established in good faith by the governing body of the Company.

(i) **Net Transaction Proceeds** means the Gross Proceeds received by the Company or the equity holders of the Company from a Change in Control transaction determined as of the effective date of the closing, but reduced by: 1) the fees, costs and expenses incurred on, before or in connection with, the Change in Control transaction, including attorney, financial advisor, accountant fees, commissions and expenses incurred in the sales process, negotiation, execution and delivery of definitive and ancillary agreement(s) for the Change of Control transaction; and 2) all debts and liabilities of the Company.

(j) **Parties** shall collectively refer to the Company and the Employee.

(k) **Related Entities** means the Company and all persons with whom the Company would be considered a single employer under Code Section 414(b), (c), (m) or (o).

(l) **Release Deadline** means the twenty eight (28) day period following the delivery of the release.

(m) **Separation from Service or Separates from Service** shall mean that the Company and Employee reasonably anticipate that no further services would be performed after a certain date or that the level of bona fide services the Employee would perform after such date,

3

whether as an employee or independent contractor, would permanently decrease to no more than twenty percent (20%) of the average level of bona fide services performed, whether as an employee or an independent contractor, over the immediately preceding thirty six (36) month period, or the full period of services to the Company if the Employee has been providing services to the Company for less than thirty six (36) months.

(n)     **Unit** shall mean an accounting unit, with no monetary value, which is used to determine the amount of payment that the Employee maybe entitled to receive, pursuant to the terms of this Agreement. A Unit shall not confer any rights of ownership, including voting, or a right to acquire any ownership interest in the Company. The number of Units shall be adjusted as provided in Section 5.3.

2.2    **Interpretation**. Except as otherwise expressly provided, the following rules of interpretation shall apply to this Agreement:

(a)     Capitalized words and phrases used in this Agreement shall have the meaning given to them in Section 2.1, unless the language or context clearly indicates that a different meaning is intended.

(b)     The singular includes the plural and the plural includes the singular except when the context otherwise requires.

(c)     The masculine, feminine or neuter gender shall also mean all or any of the other genders except when the context otherwise requires.

(d)     The recitals as set forth in this Agreement are incorporated as a material term of this Agreement

(e)     A reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder.

(f)     This Agreement is intended to be an unfunded and unsecured arrangement maintained by the Company primarily for the purpose of providing deferred compensation to a select group of management or highly compensated employees. This Agreement is intended to satisfy ERISA Sections 201(2), 301(a)(3) and 401(a)(1) and shall be interpreted and construed consistent with those provisions.

(g)     Notwithstanding any provision of this Agreement to the contrary, the obligation to make payments and the time and form of those payments as required by this Agreement that constitute deferred compensation for purposes of Code Section 409A and which are not otherwise exempt from Code Section 409A are intended to comply with Code Section 409A and the interpretive guidance thereunder. This Agreement will be construed and interpreted with such intent. A right to a series of payments shall be treated as a right to a series of separate payments. If any provision of this Agreement needs to be revised or restricted to the extent and in a manner necessary to be in compliance with the requirements of Code Section

4

409A, then such provision shall be modified or restricted to the extent necessary to be in compliance the requirements of Code Section 409A and any modification will attempt to maintain the same economic results as were intended under this Agreement.

## SECTION 3
## CHANGE IN CONTROL PAYMENTS

**3.1** **Award of Units.** The Employee is awarded two thousand one hundred four (2,104) Units pursuant to this Agreement.

**3.2** **Amount.** Upon a Change in Control, the Company shall be obligated to pay to the Employee an amount equal to the product of the Net Transaction Proceeds and a fraction the numerator of which is the number of vested Units, as determined in Section 3.6, issued to the Employee as the date of closing of the Change in Control transaction and the denominator of which is the sum of all issued and outstanding Units under this and all agreements which are similar to this Agreement and the issued and outstanding common voting stock of the Company as of the date of closing of the Change in Control transaction. For this purpose, issued and outstanding common voting stock shall include stock subject to convertible interests and options irrespective of whether the right to such stock has been exercised.

**3.3** **Form of Payment.** The amount specified in Section 3.2 shall be paid on the same schedule, but subject to Section 3.4, and under the same terms and conditions as apply to payments to stockholders generally with respect to stock of the Company pursuant to a Change in Control event, provided however, that no payment shall be made to the Employee after the fifth (5th) anniversary of the closing of the Change in Control event.

**3.4** **Time of Payment.** Subject to Section 3.5, payment shall commence on the date the release becomes effective and irrevocable, provided however, if the Release Period spans two taxable years of the Employee, payment will commence on the last day of the Release Period regardless of when the release conditions have been satisfied. Any payment which becomes due during the Release Period shall be held and paid in a lump sum as provided in this Section 3.4.

**3.5** **Release.** The Employee must execute and deliver a release of claims, in the form attached as Exhibit 1, which must become effective and irrevocable no later than the last day of the Release Period. In the event that the release does not become effective and irrevocable by the last day of the Release Period, the Employee will forfeit any right to payments under this Agreement.

**3.6** **Vesting.** The vested portion of the Units shall be determined by multiplying the Units by the sum of the incremental vested percentages set forth in the applicable table below as further adjusted as provided in this subsection. The incremental vesting percentage for the vesting computation period stated in the tables shall be determined by multiplying the applicable incremental vesting percent from the applicable table by a fraction the numerator of which shall be the number of days of service performed in the vesting computation period prior to a Separation from Service and the numerator of which is three hundred sixty five (365).

Notwithstanding the previous sentence to the contrary, the fraction shall be rounded to ten thousandths (four (4) decimal places).

(a) Tranche 1 consisting of one thousand fifty two (1052) Units shall vest in accordance with the following schedule:

| Vesting Event | Incremental Vested Percentage |
|---|---|
| Upon execution of this Agreement | 25% |
| Vesting Computation Period Commencing November 1, 2025 and ending October 31, 2026 | 15% |
| Vesting Computation Period Commencing November 1, 2026 and ending October 31, 2027 | 25% |
| Vesting Computation Period Commencing November 1, 2027 and ending October 31, 2028 | 25% |
| Upon the manufacture of 10 propellers in the Harper Woods facility and shipment to wholesale or retail customers | 10% |

(b) Tranche 2 consisting of one thousand fifty two (1052) Units shall vest in accordance with the following schedule:

| Vesting Event | Incremental Vested Percentage |
|---|---|
| Vesting Computation Period Commencing November 1, 2025 and ending October 31, 2026 | 33⅓% |
| Vesting Computation Period Commencing November 1, 2026 and ending October 31, 2027 | 33⅓% |
| Vesting Computation Period Commencing November 1, 2027 and ending October 31, 2028 | 33⅓% |

(c) In the event that the aggregate number of vested Units on the date of a Change in Control is less than one thousand fifty two (1052) Units, the Employee shall vest in such additional Units that when added to the vested Units will equal one thousand fifty two (1052) Units provided that the Employee has not Separated from Service before the Change in Control date.

(d) Any Units which are not vested pursuant to the terms of this Section 3.6 shall be forfeited.

**3.7** **Payroll Practices**. All payments made shall be subject to all applicable federal, state, and local withholding taxes, rules, and regulations and the Company's regular payroll practices.

## SECTION 4
## AMENDMENT

**4.1** **Amendment.** The Company shall have the right to amend this Agreement at any time. Any such amendment shall become effective as provided therein.

**4.2** **Termination**. The Company shall have the right to terminate this Agreement at any time in accordance with Code Section 409A, to the extent applicable. Such termination shall become effective as designated by the Company.

**4.3** **Effect of Amendment or Termination**. Except as otherwise provided in Code Section 409A, any benefit which is payable shall remain subject to the provisions of the Agreement and no payment shall be accelerated because of termination of this Agreement. No amendment or termination of this Agreement shall, directly or indirectly, reduce any benefit which is nonforfeitable under this Agreement. The benefit will continue to be paid in accordance with this Agreement until all benefits are paid or made available to the Employee.

## SECTION 5
## MISCELLANEOUS PROVISIONS

**5.1** **Employee's Rights**. This Agreement shall not be deemed to constitute a contract of employment between the Company, or its parent, and the Employee or to be a consideration or an inducement for the employment of the Employee. Nothing contained in this Agreement shall be deemed to give the Employee the right to be retained in the service of the Company, or its parent, or to interfere with any right of the Company, or its parent, to discharge the Employee at any time regardless of the effect which such discharge shall have upon the Employee under this Agreement.

**5.2** **Effect on Other Benefits**. Amounts paid pursuant to the terms of this Agreement are not taken into account in the calculation of an Employee's benefits under any employee

pension or welfare benefit program or under any other compensation practice maintained by the Company, or its parent, except to the extent provided in such program or practice.

**5.3  Adjustments**. The Employee recognizes that the Company may issue additional securities in the future for a variety of corporate purposes, including equity financing, stock-based compensation, and acquisitions. The Employee acknowledges that any such issuances could dilute the percentage interest described in Section 3.2 and the amount to which the Employee may be entitled to receive. The Employee accepts and consents to a potential dilution as a necessary aspect of the Company's growth

**5.4  Liability**. Nothing contained in this Agreement shall impose on any officer, director or employee of the Company, or its parent, any personal liability for any benefit due the Employee pursuant to this Agreement.

**5.5  Assignment**. This Agreement, nor any rights or obligations under this Agreement, may be assigned by any Party without the prior written consent of all other Parties.

**5.6  Alienation**. No benefit which shall be payable to the Employee shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, or charge the same shall be void; and no such benefit shall in any manner be liable for or subject to, the debt, contracts, liabilities, engagements or torts of any such person, nor shall it be subject to attachment or legal process for or against such person, and the same shall not be recognized by the Company, except to such extent as may be required by law.

**5.7  Complete Agreement**. This Agreement represents the entire agreement of the Parties, and supersedes any and all prior or contemporaneous agreements, concerning this subject matter, whether written, unwritten, express or implied. The Parties acknowledge that there are no oral representations, understandings, or agreements relating to this Agreement which are not fully expressed herein.

**5.8  Severability**. If any provision of this Agreement shall be held by any court of competent jurisdiction to be invalid or unenforceable, the remaining provisions hereof shall continue to be fully effective, unless the removal of the invalid or unenforceable provision would substantially defeat the basic intent, purpose and spirit of this Agreement.

**5.9  Notices**. Any notice to be given pursuant to this Agreement shall be in writing and shall be sent by registered or certified mail, return receipt requested, with postage prepaid, to such address as from time to time may be designated by the Parties. Notice hereunder shall be deemed to have been received by the person to whom addressed at the time it is deposited with the postal service.

**5.10  Construction**. This Agreement was prepared and negotiated by all the Parties to this Agreement, and all provisions contained in this Agreement shall be construed without

prejudice to the Party that actually memorialized this Agreement in final form. This Agreement shall be considered to be drafted by all the Parties to this Agreement.

    **5.11**    **Governing Law**. This Agreement shall be construed and enforced according to the laws of the State of Michigan except to the extent that such laws are preempted by the laws of the United Sates, in which case the laws of the United States shall apply.

    **5.12**    **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same Agreement. The counterparts of this Agreement may be executed and delivered by facsimile or other electronic means by any of the Parties to any other party and the receiving party may rely on the receipt of such document so executed and delivered by facsimile or other electronic means as if the original had been received.

## SECTION 6
## SIGNATURES

This Agreement is signed on the dates indicated below, but effective as of the Effective Date.

| COMPANY: | EMPLOYEE: |
|---|---|
| By: _____ <br> _____ <br> Its: CEO <br> Dated: _____, 2025 | By: _____ <br>     Robert Morehardt <br> Dated: _____, 2025 |

# EXHIBIT 1
# RELEASE

## SECTION 1
## RELEASE

This Release is made by and between Sharrow Engineering, Inc. and Robert Morhardt.

## SECTION 2
## RECITALS

**2.1** **Summary.** This Release is given pursuant to a Change in Control Agreement between the Company and the Employee.

**2.2** **Incorporation.** A term used in this Release shall be given the same meaning as the term is defined in the Change in Control Agreement.

## SECTION 3
## RELEASE

**3.1** Change in Control. The Company has experienced a Change in Control as of _____ ("CIC Date") and the Employee has become entitled to Change in Control payment subject to, among other things, the execution of this release.

**3.2** Release. In exchange for the amounts which may be payable, as described in the Change of Control Agreement, Employee, for himself and any person or representative claiming through him, releases and forever discharges the Company, its parent company, subsidiaries, and affiliated organizations, successors and assigns and its/their past and present directors, officers, employees, agents, attorneys, benefit plans and plan administrators, sureties and insurers (collectively "Releasees") from all claims, liabilities, demands, costs, attorney fees, causes of action and damages, including all consequential and incidental damages, whether known or unknown, arising from the beginning of time to the date of this Agreement, including without limitation those relating directly or indirectly to Employee's employment with the Company and all claims for personal injury, defamation, breach of contract, wrongful discharge, violation of due process or civil rights and violation of any federal, state or local statute, law or ordinance and the common law, including without limitation violation of the Employee Retirement Income Security Act, the Age Discrimination in Employment Act, Title VII of the Civil Rights Act, the Fair Labor Standards Act, the Family and Medical Leave Act, the Americans with Disabilities Act, the Equal Pay Act, including any similar state or local law, and/or any federal, state or local law regarding discrimination

      (a)    This Release and waiver of claims shall not extend to claims:

        (1)    with respect to rights to or distributions from any qualified retirement plan to which the Employee would be entitled, if any. Distributions from any qualified retirement plan shall be made to Employee in accordance with the terms and conditions of the qualified retirement plan making the distribution;

        (2)    rights under an Employment Agreement of even date between the parties;

        (3)    benefits pursuant to COBRA or similar laws providing for the continuation of health care benefits; or

        (4)    arising out of a breach of the Change in Control Agreement.

    (b)    It is understood and agreed by the Employee that the facts and respective assumptions of law in contemplation of this Release may hereafter prove to be other than or differ from those facts and assumptions now known, made or believed by them to be true. Employee expressly accepts and assumes the risks of the facts and assumptions to be so different. Except as otherwise provided in this Release, Employee agrees that all terms of this Release shall be in all respects effective, complete and not subject to termination or rescission by any such difference of facts or assumptions of law.

    **3.3**    **Final Release.** Employee agrees and understands that except for the exceptions set forth in this Release, this is a full and final release in complete settlement of all claims and rights of every nature and kind whatsoever which Employee has or may have against the Company and other Releasees. Employee acknowledges that Employee does not have any personal injuries and/or disabilities related to Employee's employment with the Company. Employee further acknowledges that Employee has received all the leave to which Employee is entitled under Company's policies.

    **3.4**    **Waiver.** Employee waives any right to monetary recovery should any administrative or governmental agency or any other person or entity pursue any claims on Employee's behalf.

    **3.5**    **Representations and Acknowledgments.** Employee represents and acknowledges the following:

    (a)    Employee has been given until _____, **[insert the date that is 28 days after the closing date]** a period of at least twenty-eight (28) days from the CIC Date, in which to consider this Release. If executed prior to such date, the Employee acknowledges that Employee voluntarily waives the balance of such period.

    (b)    Employee has been advised by Company to consult with an attorney.

11

(c) The amounts which are payable under the Change in Control Agreement which Employee will be receiving in consideration of this Release exceeds the value of anything to which Employee is entitled from Company.

(d) This Agreement shall not be effective or enforceable for a period of seven (7) days following the date of Employee's signature below, during which time only, Employee may revoke the Agreement. Any such revocation must be in writing, signed by Employee and delivered or mailed so as to arrive within such seven (7) day period to the _____ at _____. [insert address to where revocation must be sent]

(e) Employee has returned all Company's property to Company.

(f) Employee has not assigned any rights being released under this Agreement.

## SECTION 4
## MISCELLANEOUS

**4.1  Binding Effect.** This Release shall be binding upon and inure to the benefit of the Parties and their respective heirs, personal representatives, successors and assigns.

**4.2  Assignment.** Neither this Release, nor any rights or obligations under this Release, may be assigned by any Party without the prior written consent of all other Parties.

**4.3  Complete Agreement.** This Release represents the entire agreement of the Parties, and supersedes any and all prior or contemporaneous agreements, concerning this subject matter, whether written, unwritten, express or implied. The Parties acknowledge that there are no oral representations, understandings, or agreements relating to this Release which are not fully expressed herein.

**4.4  Severability of Provisions.** Any provision of this Release which is determined to be invalid or unenforceable, shall not affect the remainder of this Release, which shall remain in effect, unless the removal of the invalid or unenforceable provision would substantially defeat the basic intent, purpose and spirit of this Release.

**4.5  No Third Party Beneficiary.** The Parties do not intend to confer any benefits under this Release on any other person or entity.

**4.6  Extension, Modification and Waivers.** This Release may be modified or amended only by the written agreement of the Parties. No waiver of any breach of any provision of this Release shall constitute a waiver of any preceding or succeeding breach of the same provision. No extension of the time for performance of any obligation or other act shall be deemed to be an extension of the time for the performance of any other obligation or any other act.

**4.7     Governing Law**. This Release shall be governed by and construed pursuant to the laws of the State of Delaware, regardless of where the Parties may reside.

**4.8     Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same Agreement. The counterparts of this Agreement may be executed and delivered by facsimile or other electronic means by any of the Parties to any other party and the receiving party may rely on the receipt of such document so executed and delivered by facsimile or other electronic means as if the original had been received.

## SECTION 5
## SIGNATURES

The Parties has signed this Release on the dates indicated below and this Release shall be effective when it no longer subjection to revocation by the Employee.

COMPANY:                                                        EMPLOYEE:

By: ___SAMPLE_____       By: ___SAMPLE_____
                                                                        Robert Morehardt
Its: CEO                                                             Dated:_____, 2025
Dated: _____, 2025

13