# Exhibit G

THIS SENIOR SECURED CONVERTIBLE PROMISSORY NOTE AND THE CLASS A PREFERRED STOCK ISSUABLE UPON CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), OR THE SECURITIES LAWS OF ANY STATE. THE SECURITIES REPRESENTED HEREBY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED UNLESS THE SECURITIES ARE REGISTERED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, OR, BASED ON AN OPINION OF COUNSEL, IN FORM AND SUBSTANCE REASONABLY ACCEPTABLE TO THE CORPORATION, SUCH OFFER, SALE OR TRANSFER IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THOSE LAWS. THE HOLDER OF THIS NOTE IS ENTITLED TO THOSE RIGHTS OF CONVERSION, AND PURCHASE OPTION, SET FORTH HEREIN. SUCH CONVERSION UNITS AND OPTION STOCK HAVE LIKEWISE NOT BEEN REGISTERED AND ARE SUBJECT TO RESTRICTIONS AGAINST TRANSFERRABILITY.

## SHARROW ENGINEERING INC.
## SENIOR SECURED CONVERTIBLE PROMISSORY NOTE

FOR VALUE RECEIVED, Sharrow Engineering Inc., a Delaware corporation ("*Corporation*"), promises to pay to the order of the individual or entity identified at Exhibit A, the initial registered holder hereof, or his/her/its permitted assign ("*Holder*"), upon the terms set forth below, the principal sum set forth on Exhibit A, plus interest on the unpaid principal balance hereof at the rate of eight-percent (8%) per annum, simple interest, non-compounding ("*Stated Rate*").

This Note is issued pursuant to that certain Subscription Agreement of even date herewith by and between the Corporation and Holder ("*Subscription Agreement*"), which is incorporated into that certain offering of the Notes ("*Offering*"). All capitalized terms used in this Note, but not otherwise defined herein, shall have the meanings ascribed to them in the Subscription Agreement. The term "*Note*" and all references thereto, as used throughout this instrument, shall mean this instrument as originally executed, or if later amended or supplemented, then as so amended or supplemented. The "*Effective Date*" of this Note is set forth on Exhibit A.

The Corporation shall use the funds under this Note to pay outstanding third party payables as they become due and for working capital.

1. **Calculation of Interest; Payments of Principal and Interest.**

    (a) Interest on the outstanding principal balance hereof shall be calculated at the Stated Rate based on a 365 day year and shall commence accruing on the date hereof and, to the extent not converted in accordance with the provisions hereof, shall be payable in arrears on the fifth (5th) day (if such day is not a Business Day (as defined in Section 5(c)(i) below) then the next Business Day) of each calendar month following the date hereof and at such time as the outstanding principal balance hereof with respect to which such interest has accrued becomes due and payable hereunder.

    (b) The principal balance and accrued but unpaid interest under this Note (to the extent not converted in accordance with the terms of this Note) shall be due and payable by or before June 30, 2027 ("*Maturity Date*"), notwithstanding date of funding of the Subscription Agreement. To the extent the Holder does not timely exercise the Conversion Right, as defined in Section 5, the Note shall continue to earn interest at the Stated Rate or Default Rate, as defined in Section 3(b), where applicable.

    (c) The Corporation is not permitted to prepay the principal balance and interest under this Note (to the extent not converted in accordance with the terms of this Note) in whole or in part without the advance written consent of the Holder.

(d)    Any payments of principal and accrued interest owing under this Note shall be made in cash, by either check payable to the order of Holder or by wire transfer of immediately available funds pursuant to written wiring instructions from Holder.

2.    **Covenants and Representations.**

(a)    The Corporation will at all times cause to be done all things necessary or appropriate to preserve and keep in full force and effect its corporate existence and the corporate existence of any significant subsidiary (as defined in Rule 405 of the rules and regulations of the Securities Act) of the Corporation (each, a "*Significant Subsidiary*").

(b)    The Corporation will reasonably maintain in good repair, working order and condition, reasonable wear and tear excepted, its properties and other assets, and those of any Significant Subsidiary, and from time to time make all necessary or desirable repairs, renewals and replacements thereto.

(c)    The Corporation will, and will cause any Significant Subsidiary to, pay or discharge or cause to be paid, set aside for payment or discharge, before the same shall become delinquent, all taxes, assessments and governmental charges levied or imposed upon the Corporation or any Significant Subsidiary, as the case may be, or upon their respective income, profits or property; provided, that neither the Corporation nor any Significant Subsidiary shall be required to pay or discharge, or cause to be paid or discharged, any such tax, assessment, charge or claim whose amount or validity is being contested in good faith by appropriate proceedings.

(d)    The Corporation will, and will cause any Significant Subsidiary to, comply in all material respects with all applicable statutes and regulations of the United States of America and of any state or municipality, and of any agency thereof, in respect of the conduct of business and the ownership of property by the Corporation or any Significant Subsidiary; provided, that nothing contained in this Section 2(d) shall require the Corporation or a Significant Subsidiary to comply with any such statute or regulations so long as its legality or applicability shall be contested in good faith.

(e)    The Corporation represents and warrants to Holder that with respect to all Intellectual Property (defined below), the Corporation either (i) owns the exclusive and entire right, title, and interest in and to such Intellectual Property, or (ii) possesses adequate licenses or other rights to use such Intellectual Property. The Corporation has not and does not infringe on or misappropriate any intellectual property rights of others. There are no known claims, demands or proceedings pending or, to the Corporation's knowledge, threatened by any third party pertaining to or challenging the Corporation's rights to any of the Intellectual Property. To the Corporation's knowledge, none of the Intellectual Property is invalid or unenforceable. To the Corporation's knowledge, no person or entity has infringed on the Intellectual Property. The sole and exclusive right, title, and interest in and to all Intellectual Property, and rights to discoveries or inventions (whether or not patentable) owned or held by any officer, member, employee, former employee, or independent contractor engaged by the Corporation has been duly and effectively transferred to the Corporation. "*Intellectual Property*" means patents, copyrights, designs, trade secrets, trademarks, tradenames, service marks, trade dress, logos, domain names and urls (including registrations and applications for registration of any of them) and all other similar intellectual property rights, owned, used or held for use by the Corporation and necessary to the operation of its business as presently conducted and presently proposed to be conducted. For purposes of this paragraph, Corporation includes Sharrow Marine LLC, a Delaware limited liability company, and Significant Subsidiary ("*Sharrow Marine*").

(f)    The Corporation represents and warrants to Holder that Corporation has provided to Holder true and complete copies of the Corporation's most recent balance sheet. The balance sheet is in accordance with the books and records of the Corporation, which books and records are true and complete. The balance sheet fairly presents the financial position of the Corporation's business as of its date. Except as disclosed in the balance sheet, the Corporation does not have any liability or obligation in connection with its business, assets and operations, other than liabilities and obligations incurred in the ordinary course of business and consistent in nature and amount with

past practices. The Corporation has no knowledge of any circumstance, condition, event or arrangement that would hereafter give rise to any liabilities or obligations except in the ordinary course of business or as reflected in the Corporation's balance sheet.

(g) The Corporation represents and warrants to Holder that: (a) the Corporation has full limited corporate authority to enter into this Note and grant the rights to Holder, including conversion rights and purchase options, and to consummate the Offering and the transactions contemplated hereby, (b) the execution and delivery by the Corporation of this Note and the performance by the Corporation of its obligations hereunder and the consummation by the Corporation of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of the Corporation; (c) this Note has been duly executed and delivered by the Corporation, and (assuming due authorization, execution and delivery by Holder) this Agreement constitutes a legal, valid and binding obligation of the Corporation enforceable against the Corporation in accordance with its terms, subject to bankruptcy, insolvency, moratorium, reorganization and other laws of general applicability relating to or affecting creditor's rights and to general equity principles; and (d) the Certificate of Incorporation and/or Bylaws have been duly authorized, and all required approvals, consents and/or other action have been obtained/taken, constitutes a legal, valid and binding obligation of the Corporation enforceable against the Corporation in accordance with its terms, subject to bankruptcy, insolvency, moratorium, reorganization and other laws of general applicability relating to or affecting creditor's rights and to general equity principles.

3. **Events of Default.**

(a) "*Event of Default*," wherever used herein, means any one of the following events (whatever the reason and whether it shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

(i) the failure by the Corporation to make payment of principal or interest due under this Note at the Maturity Date or otherwise due and owing hereunder;

(ii) any breach by the Corporation of a material provision of this Note (other than as specified in clause (i) above) that shall not have been remedied within ten (10) days after the date on which the Corporation shall have been provided with written notice of such breach;

(iii) one or more defaults shall have occurred under any of the agreements, indentures or instruments under which the Corporation or any Significant Subsidiary then has outstanding indebtedness of any nature in excess of $1,000,000, individually or in the aggregate, and either (a) any such default results from the failure to pay such indebtedness at its stated maturity, (b) any such default has resulted in the acceleration of the maturity of such indebtedness, or (c) any such default is under any other similar Note sold under any convertible note or similar instrument of the Corporation;

(iv) a final, nonappealable judgment or judgments for the payment of money aggregating in excess of $500,000 are rendered against the Corporation or any Significant Subsidiary and which judgments are not, within sixty (60) days after the entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within sixty (60) days after the expiration of such stay; provided, however, that any judgment which is covered by insurance or an indemnity from a credit worthy party shall not be included in calculating the $500,000 amount set forth above so long as the Corporation provides the Holder a written statement from such insurer or indemnity provider (which written statement shall be reasonably satisfactory to the Holder) to the effect that such judgment is covered by insurance or an indemnity and the Corporation will receive the proceeds of such insurance or indemnity within thirty (30) days of the issuance of such judgment;

3

(v) any breach by the Corporation of any material covenant, agreement, representation, or warranty contained in the Subscription Agreement not remedied within thirty (30) days after the date on which the Corporation shall have been provided with written notice of such breach;

(vi) the Corporation consolidates with or merges into any other entity or transfers all or substantially all of its assets to any person or entity by operation of law or otherwise unless (a) such entity formed by such consolidation or into which the Corporation is merged or to which all or substantially all of the assets of the Corporation are transferred is an entity that expressly assumes all of the obligations of the Corporation under this Note and (b) after giving effect to such transaction, no Event of Default and no event which, after notice or lapse of time, or both, would become an Event of Default, shall have occurred and be continuing;

(vii) Holder's reasonable determination of an occurrence of (A) any material change in the condition or affairs (financial or otherwise) of the Corporation that causes Holder to deem the Corporation incapable of paying its debts in the usual course or is otherwise insolvent, or (B) any material impairment in the value of the Collateral, as defined below, where "*material impairment*" means a significant reduction in the value, usefulness, or marketability of the Collateral, or where due to such reduction, impairs the Corporation's ability to perform its payment and performance obligations owed to Holder under this Note; or

(viii) any commencement by the Corporation or any Significant Subsidiary of a case under any applicable bankruptcy or insolvency laws as now or hereafter in effect or any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Corporation or any Significant Subsidiary; or any commencement against the Corporation or any Significant Subsidiary of any bankruptcy, insolvency or other proceeding which remains undismissed for a period of sixty (60) days; or the adjudication of the Corporation or any Significant Subsidiary as insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered; or the appointment of any custodian, receiver or the like for either the Corporation or any Significant Subsidiary or any substantial part of either the Corporation's or any Significant Subsidiary's property which continues undischarged or unstayed for a period of sixty (60) days; or any general assignment by either the Corporation or any Significant Subsidiary for the benefit of its creditors; or any failure to pay or statement in writing by either the Corporation or any Significant Subsidiary indicating an inability to pay its debts generally as they become due.

(b) If any Event of Default occurs, then upon such occurrence, in addition to all rights and remedies of Holder under this Note, applicable law or otherwise, all such rights and remedies being cumulative, not exclusive and enforceable alternatively, successively and concurrently, Holder may, at its option, declare due any or all of the Corporation's obligations, liabilities and indebtedness owing to Holder under this Note whereupon the then unpaid aggregate balance thereof together with all accrued but unpaid interest thereon as of such date shall immediately be due and payable, together with all expenses of collection hereof, including, but not limited to, attorneys' fees and legal expenses (for this purpose, the Corporation shall pay all trial and appellate attorneys' fees, costs and expenses, paid or incurred by Holder in connection with collection of this Note). If the foregoing unpaid aggregate balance, accrued interest, expenses and collection costs are not paid upon demand upon the occurrence of an Event of Default (collectively, the "*Default Balance*"), such Default Balance shall bear interest until paid in full at the Stated Rate plus 3.00% per annum or the maximum interest rate then permitted under applicable law (whichever is less) ("*Default Rate*"). From and after maturity of this Note (whether upon the scheduled Maturity Date, or by acceleration or otherwise), the Default Balance shall bear interest until paid in full at the Default Rate. Holder need not provide and the Corporation hereby waives any presentment, demand, protest or other notice of any kind, and Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law. Such declaration may be rescinded and annulled by Holder at any time prior to payment hereunder.

4. **Secured Obligations.**

(a) <u>Definitions</u>. The following terms are used herein as defined in the UCC: "*Accounts*," "*Certificated Security*," "*Chattel Paper*," "*Commercial Tort Claims*," "*Deposit Accounts*," "*Documents*," "*Equipment*," "*General Intangibles*," "*Goods*," "*Instruments*," "*Inventory*," "*Investment Property*," "*Letter-of-Credit Rights*," "*Payment Intangibles*," "*Proceeds*," "*Real Estate*," "*Securities*," "*Software*" and "*Supporting Obligations*." When used herein the following terms have the indicated meanings:

"*Borrower Obligations*" means all of Corporation's payment and performance obligations now or in the future owing to Holder including under the Notes subject to the rights of similarly situated holders of the Notes under the terms of that certain "*Intercreditor Agreement*" attached at Exhibit E to the Offering.

"*Business Records*" means all of the Corporation's and Significant Subsidiary's books and records including all of the following: ledgers, records indicating, summarizing or evidencing the Corporation's and each Significant Subsidiary's assets (including the Collateral) or liabilities; all information relating to the Corporation's and each Significant Subsidiary's business operations or financial condition; and all computer programs, disk or tape files, printouts, runs or other computer prepared information, and the equipment containing the information.

"*Collateral*" means, in the broadest sense under the Code, all of the Corporation's assets and property and Proceeds thereof whether now owned or acquired in the future, including without limitation: Accounts; Business Records; Chattel Paper; Commercial Tort Claims; Deposit Accounts; Documents; General Intangibles, including Intellectual Property and Payment Intangibles; Fixtures; Goods, including Inventory and Equipment; Instruments; Investment Property; Letter-of-Credit Rights; Supporting Obligations; the Real Estate; any collateral security granted to Holder under any other agreement or document executed or delivered by Guarantor (including assignments of life insurance policies); and all accessions to, substitutions for, and all replacements, and cash and non-cash Proceeds of any of the foregoing, including Proceeds of insurance and unearned insurance premiums and claims against any Person for loss, damage, or destruction of any property, and all other related, but not specifically identified, intellectual property, general intangibles, claims, accounts, fees, documents, accounts, entitlements, chattel paper and electronic chattel paper related thereto; all Business Records relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions and accessions to and proceeds thereof. The Collateral does not include, however, those assets defined in the financing statements related to the Permitted Liens.

"*Intellectual Property*" is given the meaning in <u>Section 2(e)</u>, above, and all embodiments or fixations thereof and all related documentation, applications, registrations and franchises; all licenses or other rights to use any of the foregoing; and all Business Records relating to the foregoing.

"*Lien(s)*" means a security interest, charge, mortgage, pledge, assignment, encumbrance, hypothecation, preference or lien on or against property, but specifically excluding the Permitted Liens.

"*Permitted Liens*" means those assets defined in the following financing statements filed with (a) the State of Michigan, Secretary of State identifying the Borrower, as debtor thereunder: (i) 20221025000547-8, as amended in filing 20230727000786-8, and (ii) 20221102000161-0, and (b) the State of Delaware, Secretary of State identifying the Borrower, as debtor thereunder: (i) 20212323427, as amended in filing 20218525512, (ii) 20225878541, (iii) 20226465223, (iv) 20228855454, which identifies Sharrow Marine as an additional debtor, as amended in filing 20235164420, (v) 20229082595, (vi) 20230626613, and (vii) 20230711555.

"*Person*" means any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, institution, public benefit corporation, joint venture, entity or governmental body.

"*Secured Obligations*" means all Borrower Obligations.

"*UCC*" is the Uniform Commercial Code, as the same may, from time to time, be enacted and in effect in the State of Michigan. However, to the extent that the UCC is used to define any term in this Agreement or in any other Loan Document and that term is defined differently in different Articles or Divisions of the UCC, the definition of the term contained in Article or Division 9 will govern. Also, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, or priority of, or remedies with respect to, Holder's Lien on any Collateral is governed by the Uniform Commercial Code in effect in a jurisdiction other than the State of Michigan, the term "UCC" will mean the Uniform Commercial Code as enacted and in effect in that other jurisdiction solely for purposes of the provisions relating to attachment, perfection, priority, or remedies and for purposes of definitions relating to those provisions.

(b)   Secured Obligations. This Note shall constitute a security agreement for all purposes under applicable law. The Corporation and Sharrow Marine (collectively, "*Grantors*") hereby grant to Holder a continuing, first priority security interest (other than existing purchase money security interests on equipment) in all Collateral of Grantors. Grantors will not sell, assign, transfer, pledge or otherwise dispose of or encumber any Collateral, other than inventory in the ordinary course of business, to any third party while this Note is in effect without the prior written consent of Holder. Grantors shall execute and deliver to Holder, concurrently with the Corporation's execution of this Note and at any time or times hereafter at the request of Holder (and pay the cost of filing or recording same in all public offices deemed necessary by Holder), all financing statements, assignments, mortgages, affidavits, reports, notices, schedules of accounts, letters of authority and all other documents that Holder may reasonably request, in form satisfactory to Holder, to perfect and maintain perfected Holder's security interests in the Collateral (including without limitation enter into and record any Intellectual Property Security Agreements and records). In addition, Grantors irrevocably authorizes Holder, its agents, attorneys, and representatives, to file financing statements, amendments thereto, and any required mortgage documents at the Corporation's expense, necessary to establish and maintain Holder's perfected security interest in the Collateral. In order to fully consummate all of the transactions contemplated hereunder, the Corporation shall make appropriate entries on the Business Records disclosing Holder's security interests in the Collateral. Grantors will remain obligated hereunder notwithstanding that, without any reservation of rights against the Corporation and without notice to or further assent by Borrower, any demand for payment of any of the Secured Obligations made by Holder may be rescinded by Holder and any of the Secured Obligations continued, and the Secured Obligations, or the liability of any other Person upon or for any part thereof, or any collateral security or guaranty therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by Holder and any other documents executed and delivered in connection therewith may be amended, modified, supplemented or terminated, in whole or in part, as Holder may deem advisable from time to time, and any collateral security, guaranty or right of offset at any time held by Holder for the payment of the Secured Obligations may be sold, exchanged, waived, surrendered or released. Holder will not have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Secured Obligations contained in this Section 4 or any property subject thereto. THE RECORDING OF THE LIEN BY HOLDER AND THE CORRESPONDING FINANCING STATEMENT TO SECURE THE SECURITY INTEREST GRANTED BY THE CORPORATION HEREIN IN FAVOR OF HOLDER SHALL BE GOVERNED BY THE PROCEDURES IN THE INTERCREDITOR AGREEMENT. FURTHERMORE, FOR CLARITY, ALTHOUGH SHARROW MARINE HAS AGREED TO GRANT THE COLLATERAL UNDER THIS SECTION 4 IN CONSIDERATION OF AND AS SECURITY FOR THE CORPORATION'S PAYMENT AND PERFORMANCE OBLIGATIONS UNDER THIS NOTE AND HOLDER HAS THE RIGHT TO INVOKE ALL REMEDIES WITH REGARD TO THE COLLATERAL, SHARROW MARINE SHALL NOT BE DEEMED AN OBLIGOR OR GUARANTOR UNDER ANY OTHER PAYMENT OR PERFORMANCE OBLIGATIONS OF THE CORPORATION UNDER THIS NOTE NOT RELATED TO THE COLLATERAL.

5.   **Conversion, Purchase Option and Other Rights and Limitations.**

(a)   This Note shall be convertible into Class A Preferred Stock of the Corporation ("*Class A Preferred Stock*") as defined in the Certificate of Incorporation for the Corporation, as set forth in the Offering which is the subject of the Subscription Agreement, on the terms and conditions set forth in this Section 5(a)

("*Conversion Right*"). The Conversion Right may be exercised by Holder in the event of a "*Sale Event*," as defined under the Certificate of Incorporation, by following those provisions herein.

(i) Conversion Right. At any time after the earlier of (A) May 17, 2025, (B) the occurrence of an Event of Default, or (C) a Sale Event ("*Conversion Event*" with such date in which the occurrence of such an event in (A) through (C) occurs, ("*Conversion Open Date*"), and subject to and upon compliance with the provisions of this Note, for as long as this Note is outstanding after the Conversion Open Date and up to and including, but no later than, the Maturity Date ("*Conversion Close Date*" along with the time period between the Conversion Open Date and Conversion Close Date, the "*Conversion Period*"), the Holder shall have the right, at its option to convert any portion of the outstanding and unpaid Conversion Amount (as defined below) into fully paid and nonassessable Class A Preferred Stock pursuant to and in accordance with Section 5(c) at the Conversion Rate (as defined below), and for purpose of clarity, Holder shall then have the option, but not the obligation, to convert such Class A Preferred Stock to Class B Units pursuant to the terms of the Certificate of Incorporation. The Holder shall pay any and all taxes that may be due with respect to the issuance and delivery of Common Shares upon conversion of any Conversion Amount.

(A) Mandatory Conversion. Notwithstanding anything to the contrary herein, if the Feeks Trigger occurs on or before May 17, 2025, upon such event the Holder shall be deemed to have exercised its rights to conversion under subsection (i), above, and pursuant to subsections (ii) and (iii), below. "*Feeks Trigger*" means the date upon the occurrence of the last to occur: (1) Feeks Investments LLC or its assign ("*Feeks*"), as holder of that certain Convertible Promissory Note dated January 13, 2023 issued by the Corporation ("*Feeks Note*"), converts the Corporation's obligations thereunder into Class C Preferred Stock of the Corporation, and such conversion is acknowledged by Feeks, and (2) entry into an amendment to that certain Sixth Amended and Restated Secured Term Note by Greg Sharrow and Maren Sharrow ("*Sharrows*"), as obligors thereunder, and Feeks, as obligee, dated as of November 14, 2023, whereby such parties agree to a sum certain allegedly owed by the Sharrows thereunder ("*Sharrows Obligation*"), that such is separated from those amounts loaned by Feeks for the benefit of the Corporation, and (a) the Sharrow Obligations are repaid in full, (b) the obligation for those amounts loaned by Feeks for the benefit of the Corporation are converted into Class C Preferred Stock by Feeks.

(B) Optional Conversion. Notwithstanding anything to the contrary herein, in the event of a Conversion Event, the Corporation shall deliver written notice to the Holder advising such Holder that it shall have ten (10) business days to elect to exercise his/her/its Conversion Right. If the Holder either declines in writing to exercise his/her/its Conversion Right or fails to deliver his/her/its written election of exercise of the Conversion Right with regard to a Sale Event, the Holder shall be deemed to have waived his/her/its Conversion Right with regard to the subject Sale Event, and shall be deemed to have reserved all rights as a Holder herein (and under the Intercreditor Agreement). This option to exercise the Conversion Right upon a Sales Event is subject to the Drag Along under subsection (d), below.

(ii) Conversion Rate. The number of Class A Preferred Stock issuable upon conversion of any Conversion Amount pursuant to Section 5(a) shall be determined by dividing (x) such Conversion Amount by (y) Conversion Base (the "*Conversion Rate*"), multiplied by the total number of all Units in the Corporation ("*Units*") outstanding determined on a fully diluted, as converted basis. The following definitions apply to the calculation of the Conversion Rate:

(A) "*Conversion Amount*" means the sum of (1) the portion of the principal balance of this Note to be converted with respect to which this determination is being made, (2) accrued and unpaid interest with respect to such principal balance, if any, and (3) the Default Balance (other than any amount thereof within the purview of foregoing clauses (1) or (2)), if any.

(B) "*Conversion Base*" means, as of any Conversion Date (as defined below) or other applicable date of determination, Pre-Money Valuation, as defined in the Certificate of Incorporation on

the Effective Date, *multiplied by* .75, subject to adjustment as provided herein and under the Certificate of Incorporation (e.g., "Down Round Valuation," as defined therein).

(iii)    Mechanics of Conversion.

(A)    Conversion. To convert any Conversion Amount into Class A Preferred Stock on any date during the Conversion Period ("*Conversion Date*"), the Holder shall (A) transmit by facsimile (or otherwise deliver), for receipt on or prior to 11:59 p.m., Detroit time, on such date, a copy of an executed notice of conversion in substantially the same form as attached hereto as Exhibit B ("*Conversion Notice*") to the Corporation and (B) if required by Section 5(a)(ii)(B), surrender this Note to a common carrier for delivery to the Corporation as soon as practicable on or following such date (or an indemnification undertaking with respect to this Note in the case of its loss, theft or destruction). On or before the second (2nd) Business Day (as defined below) following the date of receipt of a Conversion Notice, the Corporation shall transmit by facsimile a confirmation of receipt of such Conversion Notice to the Corporation's Board of Directors. On or before the third (3rd) Business Day following the date of receipt of a Conversion Notice, the Manager shall either issue and deliver to the address as specified in the Conversion Notice, a certificate, registered in the name of the Holder or its designee, for the number of Class A Preferred Stock to which the Holder shall be entitled or register such number of Class A Preferred Stock on the Board of Manager's records in book-entry form in the name of the Holder or its designee. If this Note is physically surrendered for conversion as required by Section 5(a)(ii)(B) and the outstanding principal balance of this Note is greater than the principal portion of the Conversion Amount being converted, then the Corporation shall as soon as practicable and in no event later than three (3) Business Days after receipt of this Note and at its own expense, issue and deliver to the holder a new Note representing the outstanding principal balance not converted. The person or entity entitled to receive the Class A Preferred Stock issuable upon a conversion of this Note shall be treated for all purposes as the record holder or holders of such Class A Preferred Stock on the Conversion Date with their Capital Account being adjusted in the manner set forth in the Certificate of Incorporation. For purposes of this Note, "*Business Day*" means any day other than a Saturday, a Sunday or a day on which banks are authorized by law to close in Detroit, Michigan. Any other reference to "*days*" refers to calendar days.

(B)    Surrender; Record Keeping. Notwithstanding anything to the contrary set forth herein, upon conversion of any portion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Corporation unless (A) the full Conversion Amount represented by this Note is being converted or (B) the Holder has provided the Corporation with prior written notice (which notice may be included in a Conversion Notice) requesting reissuance of this Note upon physical surrender of this Note. The Holder and the Corporation shall maintain records showing the principal balance, accrued unpaid interest, if any, and the Default Balance, if any, converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Holder and the Corporation, so as not to require physical surrender of this Note upon conversion.

(b)    Purchase Option. At any time after the Effective Date but before June 30, 2027 (regardless of whether conversion of this Note has or has not occurred), the Holder may elect ("*Purchase Option*") to submit a written notice of purchase to the Corporation in the same form as set forth at Exhibit C hereto ("*Option Notice*") electing to exercise their option granted herein ("*Option Exercise Date*") to purchase Class A Preferred Stock at (i) the Conversion Base divided by (ii) the total number of Units outstanding determined on a fully-diluted, as covered bases, as of the Effective Date (defined for purposes of this subsection (b) as the "*Purchase Price*" with such Class A Preferred Stock being purchased defined as the "*Option Stock*"), but in no event, unless agreed to by the Board of Managers for the Corporation, more than the amount of the Holder's principal amount of the Note set forth on Exhibit A hereto.

(i)    The Holder shall submit with their Option Notice, an "*Accredited Investor Questionnaire*," and "*Subscription Agreement*" attached hereto at Exhibits D and E, respectively (collectively, the "*Option Documents*"). The closing of the purchase of Class A Preferred Stock under the Purchase Option shall occur upon receipt by the Corporation of fully executed Option Documents, and receipt of the Purchase Price, but

8

in no event, any later than ten (10) calendar days from the date of delivery of the Option Notice, after which time, the Option Notice shall be deemed withdrawn, but the Holder shall retain the Purchase Option until expiration of the term thereof, as set forth in subsection (vi), below.

(ii) The Option Stock shall be deemed issued in reliance on Section 4(a)(2) of the Securities Act and/or Regulation D, Rule 506(b) thereunder, and any and all applicable state or federal exemptions from registration. The Holder understands that this Purchase Option and the Class A Preferred Stock issuable upon exercise hereof are being offered and sold to it in reliance on specific exemptions from the registration requirements of state and federal securities laws and that the Corporation is relying upon the truth and accuracy of, and the Holder's compliance with, the representations (including those set forth in the Accredited Investor Questionnaire), warranties, agreements, including the Subscription Agreement, acknowledgments and understandings of the Holder set forth herein in order to determine the availability of such exemptions and the eligibility of the Holder to acquire and hold this Purchase Option and the Class A Preferred Stock issuable upon exercise hereof.

(iii) The Holder is acquiring and holding this Purchase Option, and upon exercise hereof, will acquire the Class A Preferred Stock issuable upon exercise thereof, for his/her/its own account for investment only and not with a view towards, or for resale in connection with, the public sale or distribution thereof. Upon full performance by Holder of the Subscription Agreement, and execution of the Joinder Agreement, such Holder shall be deemed admitted as a Class A Member in the Corporation.

(iv) This Purchase Option does not entitle the Holder to any voting rights or other rights as a member of the Corporation prior to the exercise hereof. This Purchase Option and all rights hereunder are not transferable, in whole or in part.

(v) The Purchase Price shall be adjusted in the same manner as the Conversion Base, as set forth herein, and in the Certificate of Incorporation.

(vi) The Purchase Option shall be terminated upon the earlier of (i) the Conversion Close Date, or (ii) mutual termination by the Holder and the Corporation.

(c) Drag Along by Majority Holders. If the majority of the Holders of the Notes, after closing of the Offering, determined by the total Principal balance of all Notes issued ("*Majority Holders*"), elects to convert their Notes into Class A Preferred Stock, all Holders shall be deemed to have made the same election to convert pursuant to the Conversion Rate ("*Drag Along*"). The Corporation shall provide written notice to all Holders of the Drag Along within five (5) Business Days of receiving such election from the Majority Holders. The notice shall specify the Conversion Rate and proposed date of conversion (the "*Drag Along Closing Date*"). Following the Drag Along Closing Date, all Holders shall be deemed to have surrendered their Notes back to the Corporation, and all outstanding Notes shall be deemed automatically terminated and cancelled in their entirety, in consideration for the Class A Preferred Stock, without any further action by the Corporation or Holders. The Drag Along shall be binding upon all Holders, their heirs, successors, and assigns, and shall be governed by and construed in accordance with this Note and the Certificate of Incorporation.

(d) Mergers. In the case of any consolidation or merger of the Corporation with any other entity (each such transaction, a "*Merger*"), the entity formed by the Merger shall succeed to the covenants, stipulations, promises and the agreements contained in this Note. In the event of a Merger, the Corporation shall make appropriate provisions so that the Holder shall have the right thereafter to convert this Note into the kind and amount of securities receivable upon such Merger by the Holder of the number of securities into which this Note could have been converted immediately prior to such Merger. This provision shall similarly apply to successive Mergers. For clarity, a Merger constitutes a Sale Event under the Certificate of Incorporation.

(e) Distributions. In addition to and not in substitution for any other rights hereunder, pursuant to which holders of Class A Preferred Stock are entitled to receive securities or other assets with respect to or in exchange for Class A Preferred Stock other than upon consummation of a Merger (a "*Corporate Event*"), the

9

Corporation shall make appropriate provision to insure that the Holder will thereafter have the right to receive upon a conversion of this Note, (i) in addition to the Class A Preferred Stock receivable upon such conversion, such securities or other assets to which the Holder would have been entitled with respect to such Class A Preferred Stock had such Class A Preferred Stock been held by the Holder upon the consummation of such Corporate Event (without taking into account any limitations or restrictions on the convertibility of this Note) or (ii) in lieu of the Class A Preferred Stock otherwise receivable upon such conversion, such securities or other assets received by the holders of Class A Preferred Stock in connection with the consummation of such Corporate Event in such amounts as the Holder would have been entitled to receive had this Note initially been issued with conversion rights for the form of such consideration (as opposed to Class A Preferred Stock) at a conversion rate for such consideration commensurate with the Conversion Rate. Provision made pursuant to the preceding sentence shall be in a form and substance satisfactory to Holder. The provisions of this Section 5(f) shall apply similarly and equally to successive Corporate Events and shall be applied without regard to any limitations on the conversion of this Note.

(f) <u>Reservation</u>. So long as this Note is outstanding, the Corporation shall take all action necessary to reserve and keep available Class A Preferred Stock, solely for the purpose of effecting the conversion of this Note or for purchase of Class A Preferred Stock under the Purchase Option.

(g) <u>Restricted Securities</u>. The Holder acknowledges and agrees that the Class A Preferred Stock acquired upon conversion of this Note, or through the Purchase Option, shall not be registered under the Securities Act, will constitute "restricted securities" within the meaning of Rule 144 promulgated under the Securities Act and will be subject to restrictions on resale imposed by the Securities Act and applicable states securities laws. Holder further acknowledges and agrees that each certificate representing the Class A Preferred Stock acquired upon conversion of this Note or exercise of the Purchase Option shall be registered on the Corporation's records in book-entry form, only.

(h) <u>Compliance with Applicable Laws</u>. Holder agrees to comply with all applicable laws, rules and regulations of all federal and state securities regulators, including but not limited to, the Securities and Exchange Commission, the Financial Industry Regulatory Authority, and applicable state securities regulators with respect to disclosure, filings and any other requirements resulting in any way from the issuance, transfer or conversion of this Note.

(i) <u>No Member Rights</u>. This Note shall not entitle Holder to any of the rights of a shareholder of the Corporation, including, without limitation, the right to vote, to receive distributions, or to receive any notice of, or to attend, meetings of Members or any other proceedings of the Corporation. This Section 5(i) shall not affect the rights of Holder in its capacity as a stockholder of the Corporation upon conversion of this Note and issuance to Holder of Conversion Units pursuant to this Section 5.

6. **No Waiver of Holder's Rights.** All payments of principal and interest shall be made without setoff, deduction or counterclaim. No delay or failure on the part of Holder in exercising any of its remedies, powers or rights, nor any partial or single exercise of its remedies, powers or rights shall constitute a waiver thereof or of any other remedy, power or right; and no waiver on the part of Holder of any of its remedies, powers or rights shall constitute a waiver of any other remedy, power or right.

7. **Cumulative Rights and Remedies.** The rights and remedies of Holder expressed herein are cumulative and not exclusive of any rights and remedies otherwise available under this Note or applicable law (including at equity). The election of Holder to avail itself of any one or more remedies shall not be a bar to any other available remedies.

8. **Successors and Assigns.** This Note shall be binding upon the Corporation and its successors and shall inure to the benefit of Holder and its successors and permitted assigns. This Note may not be offered, sold, assigned or otherwise transferred by Holder without the prior written consent of the Corporation and compliance with Section 5(i) hereof; provided, however, Holder may transfer this Note or the Class A Preferred Stock to any

10

accredited investor (as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act) that is an affiliate or family member of Holder or any such other entity or trust controlled by Holder or its, affiliate or family member, which is an accredited investor. Any such transfer shall not be subject to the limitations or rights of first refusal set forth in the Certificate of Incorporation. Any such transfer shall comply with applicable federal and state securities laws. The term "Holder" as used herein, shall also include any permitted endorsee, assignee or other holder of this Note.

**9.** **Lost or Stolen Note.** If this Note is lost, stolen, mutilated or otherwise destroyed, the Corporation shall execute and deliver to Holder a new senior secured convertible note containing the same terms, and in the same form, as this Note. In such event, the Corporation may require Holder to deliver to the Corporation an affidavit of lost instrument and customary indemnity in respect thereof as a condition to the delivery of any such new senior convertible note.

**10.** **Governing Law; Dispute Resolution.** This Note shall be governed by the laws of the State of Michigan without regard to its conflict of laws principles, notwithstanding the Corporation being a corporation under the laws of the State of Delaware. Each party hereby irrevocably submits to the exclusive jurisdiction of Oakland County, Michigan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS NOTE OR ANY TRANSACTION CONTEMPLATED HEREBY.

**11.** **Notices.** Any and all notices or other communications or deliverables to be provided by the Corporation or Holder hereunder shall be made (and considered given) in accordance with the provisions of the Subscription Agreement.

**12.** **Taxes.** The Corporation shall be solely responsible for any necessary tax or assessment relating to the issuance of this Note, but not any taxes or assessments related to the issuance of Common Shares, which shall be the sole responsibility of the Holder.

**13.** **Non-circumvention.** The Corporation hereby covenants and agrees that the Corporation will not, by amendment of its Certificate of Incorporation or Bylaws, or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at all times in good faith carry out all of the provisions of this Note and take all action as may be required to protect the rights of the Holder of this Note.

**14.** **Holder Agreement.** Holder by its receipt and acceptance of this Note hereby agrees to be legally bound by the provisions of this Note in all respects.

*[Signature Page for Corporation and Acknowledgment by Sharrow Marine on Next Page]*

## SIGNATURE PAGE FOR SENIOR SECURED CONVERTIBLE NOTE

IN WITNESS WHEREOF, the undersigned has signed this Note on behalf of the "Corporation" and not as a surety or guarantor or in any other capacity with such signature being effective as of the Effective Date.

SHARROW ENGINEERING INC., a Delaware corporation

*Signed by:*
*Greg Sharrow*
—E5F7312CB38D487...

By: Greg Sharrow
Its: President and Chief Executive Officer

Acknowledged and agreed to by:

SHARROW MARINE LLC, a Delaware limited liability company

*Signed by:*
*Greg Sharrow*
—E5F7312CB38D487...

By: Greg Sharrow
Its: Authorized Representative

*[Exhibit A and Exhibit B on Following Pages]*

12