**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| TEC-CAST, LLC,<br><br>                 Plaintiff,<br><br>v.<br><br>SHARROW MARINE LLC, SHARROW ENGINEERING INC. and GREGORY SHARROW<br><br>                 Defendants. | **Civil Action No. 26-CV-30035-MGM** |

**FIRST AMENDED COMPLAINT**

This is an action brought by plaintiff Tec-Cast, LLC against defendants Sharrow Marine, LLC, Sharrow Engineering Inc. and Gregory Sharrow.

**PARTIES**

1. The plaintiff, Tec-Cast, LLC ("Tec-Cast"), is a Massachusetts limited liability company with its place of business at 100 Verge Street, Springfield, Massachusetts. Tec-Cast's sole member is JLP Consulting LLC, an Ohio limited liability company. JLP Consulting LLC's sole member is Jane Whittington, a citizen of West Virginia whose address is 800 37th Street, Vienna, West Virginia. At all times relevant Robert C. Morehardt was an agent of Tec-Cast acting within the scope of his agency. To the extent Morhardt is the real party in interest to any claims asserted by Tec-Cast, the principal, in this case, Morehardt has made a total assignment of any claims to Tec-Cast.

2. The defendant, Sharrow Marine, LLC ("Sharrow Marine"),  is a Delaware limited liability company with offices at 24400 Jefferson Ave., St. Clair Shores, Michigan. Sharrow

1

Marine's resident agent in Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. Sharrow Marine is wholly owned by defendant Sharrow Engineering, Inc.

3. The defendant, Sharrow Engineering, Inc. ("Sharrow Engineering") is a Delaware corporation with offices at 1125 Berkshire Road, Grosse Pointe, MI 48230. Sharrow Engineering's resident agent in Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. Sharrow Engineering is the successor corporation to Sharrow Engineering LLC, a Delaware limited liability company which was converted to the defendant corporation on August 27, 2025 and assumes all liabilities of the limited liability company as a matter of law.

4. Defendant , Gregory Sharrow  ("Sharrow"), is an individual who resides in 1125 Berkshire Road, Gross Point Park, Michigan 48230. Sharrow is a principal shareholder in Sharrow Engineering and the Chief Executive Officer of both Sharrow Engineering and Sharrow Marine.

## JURISDICTION AND VENUE

5. The United States District Court for the District of Massachusetts has subject matter jurisdiction over these claims because of  complete diversity between the plaintiffs and the defendants and the amount in controversy far exceeds $75,000. 28 USC §§ 1332, 1391(b)(1).

6. The District Court has Long Arm jurisdiction over  Sharrow Marine, Sharrow Engineering, and their alter ego and agent, Gregory Sharrow, on Tec-Cast's contract and tort claims, G.L. c. 223A, § 3 (a) – (d),  by its transacting conducting  business in Massachusetts, contracting services in Massachusetts, causing tortious injury by an act or omission in Massachusetts, or by an act or omission outside of Massachusetts, where those Defendants regularly do or solicit

business, and/or engages in a persistent course of conduct, and/or derive revenue from goods and services in Massachusetts.

7. In so far as necessary, the District Court has supplemental jurisdiction over Plaintiff's claims against Sharrow, and Sharrow Engineering pursuant to 28 U.S.C. § 1367(a).

8. Venue is proper in the Western Division of the District Court because the only Massachusetts party, Tec-Cast, has its principal place of business in Springfield.

## FACTS

9. Sharrow Engineering was founded in 2014 to develop and produce a novel boat propeller design conceived by Sharrow.

10. Sharrow Engineering is the owner of US and international patents protecting Sharrow's propeller designs.

11. Morehardt has been in the manufacturing business as an owner and representative of a number of manufacturing companies since the 1980's.

12. In 2014, Morehardt was operating a foundry in New Jersey and a rapid prototyping company in Massachusetts.

13. Rapid prototyping is process using laser technology which fabricates prototypes patterns which are supplied to foundries for castings in metal.

14. In or around 2014, Morehardt's foundry was hired to cast a propeller in aluminum and build a hard tool for Sharrow Engineering.

15. Morehardt's rapid prototyping company provided propeller prototypes to Sharrow Engineering, which accelerated the manufacturing process for Sharrow's propellers.

16. Between 2014 and 2019, Morehardt's foundry produced a limited number of aluminum prototype propellers for Sharrow Engineering.

17. In 2019, Sharrow founded Sharrow Marine as a wholly owned propeller manufacturing company for Sharrow Engineering.

18. At its inception, Sharrow Marine leased its manufacturing machinery and sub-contracted a significant amount of its manufacturing to an independent machine shop, Detroit Dynamics and its employees.

19. Sharrow Marine purchased the raw castings for its propellers from various suppliers and Detroit Dynamics employees would mill, weld and polish castings on machines owned by Detroit Dynamics or machines leased by Sharrow Marine.

20. Sharrow Marine's earnings from the sale of propellers to customers has not been sufficient to cover its expenses.

21. Sharrow Marine has been primarily funded through the efforts of Sharrow in obtaining loans and outside investments.

22. Sharrow Marine is not worthy of extensions of credit to fund its equipment without the backing of Sharrow, Sharrow Engineering and its investors.

23. One of the manufacturing companies that Sharrow Marine purchases propeller castings from is plaintiff Tec-Cast.

24. In April of 2020, Tec-Cast began shipping orders of propeller castings from Springfield, Massachusetts to Sharrow Marine in Michigan based on Sharrow Marine purchase orders sent to Tec-Cast in Massachusetts.

25.  Sharrow Marine has always had a significant accounts payable balance with Tec-Cast.

26.  By 2023, Sharrow began offering "stock" in Sharrow Engineering to Tec-Cast for a reduction in Tec-Cast's accounts receivable. An Email message dated August 30, 2003, from Sharrow

to Morehardt, confirming an offer of stock options against a Tec-Cast receivable is attached as Exhibit A.

27. Because Sharrow Marine always had a high accounts payable balance with Tec-Cast, Sharrow has consistently sought to ease its cash flow woes by converting the receivable to stock.

28. In July of 2023, Sharrow for the first time invited Morehart to tour the Sharrow Marine facility in Michigan.

29. On October 6, 2024, Morehardt visited the Sharrow Marine plant and asked Sharrow to provide Sharrow Marine financial statements for his review to assist Morehardt in understanding Sharrow Marine operations.

30. Morehardt's review showed that Sharrow Marine was being overcharged by its subcontractor, Detroit Dynamics, for manufacturing its propellers.

31. Following that review, Sharrow used Morehardt to negotiate a business divorce between Sharrow Marine and Detroit Dynamics and then helped transition key manufacturing employees from Detroit Dynamics in-house to work for Sharrow Marine.

32. At the same time, Sharrow Marine's Accounts Payable balance to Tec-Cast remained high.

33. Sharrow Marine needed money for castings from Tec-Cast and its other suppliers in order to produce its patented marine propellers.

34. In October 2024 Morehardt offered to arrange a financing vehicle for Sharrow Marine from an investment group formed by members of Morehardt's family and others.

35. Morehardt and Sharrow, each with counsel, discussed a factoring-type arrangement wherein Sharrow Marine would essentially have a line of credit based on its own receivables.

36. The propellers themselves were not sufficient collateral for the investment group however, and additional security was required for the line of credit.

37. At the outset of negotiations to resolve the Sharrow Marine accounts payable to Tec-Cast, Sharrow offered various security including, "stock" in his other corporation, Sharrow Engineering, a security interest the propeller patents held by Sharrow Engineering, and his personal guaranty secured by a mortgage on his residence, and finally a security interest in the manufacturing equipment of Sharrow Marine.

38. Each of these offers of collateral was withdrawn by Sharrow for one reason or another as discussions continued; in the meantime, Tec-Cast relied to its detriment on Sharrow's commitment to provide security for the Sharrow Marine indebtedness to Tec-Cast.

39. In truth, Sharrow, individually and/or as an agent of Sharrow Marine and Sharrow Engineering was stringing Tec-Cast along, was offering collateral he could not deliver, and knew he could not deliver, because if he put up that collateral and security to Tec-Cast, this would effect his ability to secure larger financing.

40. Ultimately Sharrow agreed that Sharrow Marine and Sharrow Engineering would be the co-borrowers under the factoring agreement, and Sharrow would himself personally guaranty the indebtedness to Tec-Cast. A copy of the execution copy of the unsigned factoring agreement is attached as Exhibit B.

41. Before signing the factor agreement, Sharrow requested a draw of $70,000 from Tec-Cast as a bridge loan to satisfy a Detroit Dynamics demand for partial payment during their negotiations, which Sharrow Marine did not have.

42. Tec-Cast then gave Sharrow the $70,000 bridge loan based on Sharrow's assurances that the factor arrangement and guarantee would be put in place, and Tec-Cast relied on those assurances in making the loan, and the loan would not have been made without the inducement of those assurances.

6

43. In early November, 2024, when the final factoring agreement had been agreed to between counsel for the lender and counsel for Sharrow Marine and Sharrow Engineering, Sharrow delayed the signing and said he was going to confer with his personal counsel.

44. In fact, during the interim, Sharrow had no intention to close on the agreed-to factoring agreement and was stringing Tec-Cast along and using the delay to negotiate a deal with an equity investor.

45. Sharrow closed that deal with his private equity financing and refused to go forward with the factoring agreement with Tec-Cast.

46. During the financing negotiations and the separation of Detroit Dynamics for leased equipment and employees, Sharrow induced Morehardt, to take over and assume production management duties at Sharrow Marine.

47. In October of 2024, Sharrow told Morehardt he intended to make him "Interim Director of Manufacturing and Production."

48. Initially, in November of 2024, this meant Morehardt worked to improve production on the shop floor, transitioning manufacturing from Detroit Dynamic and getting a weekend manufacturing shift running.

49. By late November 2024, Morehardt's efforts nearly doubled weekly production of propellers at Sharrow Marine.

50. During this period, the Sharrow Marine credit card was frequently maxed out and Morehardt was required to use his personal credit card for purchases.

51. Because of Morehardt's value to the company, in December 2024, Sharrow asked Morehardt to come to live in Michigan for a month.

52. In late January and February of 2025, Sharrow obtained his new private equity financing.

53. By February 2025, Morehardt assumed the position of Director of Manufacturing at Sharrow Marine with production reporting to him.

54. Morehardt reported only to Sharrow.

55. Also in February, 2025 Sharrow promised Morehardt an employment contract, and in reliance on that promise Morehardt, as agent for Tec-Cast, continued working for Sharrow Marine.

56. Morehardt's role as Director of Manufacturing at Sharrow continued until near the end of 2025.

57. Meanwhile, Sharrow Marine had been ordering and receiving castings from Tec-Cast, LLC in Massachusetts and was only sporadically paying the invoices, which created a large accounts payable balance that continued to accrue.

58. Morehardt repeatedly asked Sharrow as to the status of his employment contract, but was given assurances, strung along and did not receive one.

59. In addition to his regular management responsibilities, in July of 2025, Sharrow asked Morehardt to take on additional responsibilities and oversee the move of heavy manufacturing equipment to a new facility.

60. In that move Morehardt was in charge of working with riggers, electricians and plumbers to coordinate the moving of heavy equipment to the new facility.

61. The moving into the new facility continued from July until substantial completion in December, 2025.

62. In July, 2025 negotiations with Morehardt concerning his employment contract commenced. While an agent of Tec-Cast, Morehardt had already been providing Director of Manufacturing Services since November, 2024.

63. From the outset, it was intended that Morehardt's primary compensation for his position as Director of Manufacturing would be an equity interest, stock, in Sharrow Engineering. Attached as Exhibit C is a spread sheet from Sharrow Engineering to Morehardt created in August 2025, showing a stock compensation proposal for Morehardt.

64. As such, the first draft of the employment agreement, effective, November 1, 2025, stated that the employer was Sharrow Engineering and the salary was a modest $36,000, presumably the exempt employee minimum salary plus fringe benefits. A copy of an initial employment agreement draft is attached as Exhibit D.

65. The true compensation for Morehardt's services was a stock incentive agreement with Sharrow Engineering providing for what was then a grant of a 1% interest in the company over a four year vesting schedule.

66. After negotiations it would become a 2% interest in the company, vesting over 3 years, with the company valued at the time at $180,000,000.00. A copy of the stock compensation agreement ("CIC") tendered to Morehardt from Sharrow Engineering is attached as Exhibit E.

67. Importantly, because Morehardt had already been providing services to Sharrow Marine for one year as of November 1, 2025, the final agreement provided that 25% of one-percent of Sharrow Engineering would vest upon execution of the stock compensation agreement.

68. The initial 25% of one-percent vesting was for services already rendered by Morehardt while he was working for Tec-Cast, LLC.

69. In addition, Sharrow Marine also negotiated a supplier agreement with Tec-Cast to supply its casting needs going forward and was negotiating to resolve Sharrow Marine's $333,095.00

accounts payable arrearage to Tec-Cast. A copy of the proposed supplier agreement is attached hereto as Exhibit F.

70. The Supplier Agreement provided that the defendants would purchase castings from Tec-Cast in a certain volume and Tec-Cast would supply the castings for the term Morehardt was employed.

71. Although the Supplier Agreement was not executed, the parties performed under the terms of the Supplier Agreement for the remainder of Morehardt's employment.

72. Sharrow Engineering, as debtor, offered Morehardt a $250,000 convertible note (representing $250,000 of the $333,095 Sharrow Marine accounts payable to Tec-Cast) which could be converted to stock in Sharrow Engineering upon the happening certain events. A copy of the form of convertible note from Sharrow Engineering is attached hereto as Exhibit G.

73. Ultimately, Morehardt did not subscribe to the Sharrow Engineering convertible note offering because Tec-Cast, to whom the accounts payable was owed, was not a qualified investor under the terms of the subscription.

74. Instead, Morehardt negotiated short term promissory notes with Sharrow Marine, guaranteed by Sharrow Engineering, for the full account receivable. Once more, Tec-Cast relied to its detriment on Sharrow's assurances, only to have the rug pulled out from under it after it was strung along and further services and reliance were rendered. Ultimately, the promissory notes were never signed.

75. On December 15, 2025, after Morehardt and Tec-Cast's counsel had negotiated all the terms of the various employment and Tec-Cast supplier documents, and the documents went to hard copy for signatures, Sharrow fired Morehardt on a pretext, refused to sign the agreements, and excluded Morehardt from the Sharrow Engineering plant.

76. As of the date of the firing, the vesting events under the stock agreement would have entitled Morehardt to 40.6% of one-percent of the company (valued at the time at $180,000,000) for a total vested value of $730,800.00.

77. In addition, Morehardt is owed $36,000 for one-year of salary.

78. Tec-Cast is owed $339,095 for unpaid invoices with 12 percent pre-judgment interest from the date of breach and continuing.

### COUNT I--TEC-CAST, LLC  v.  SHARROW MARINE
(Breach of Contract)

79. The plaintiff restates it allegations to the previous paragraphs in the complaint.

80. Sharrow Marine issued purchase orders for propeller castings at an agreed price.

81. The plaintiff delivered castings to Sharrow Marine in compliance with the purchase orders and industry standards, which were accepted by Sharrow Marine.

82. Sharrow Marine acknowledged its obligation to pay for the castings, but has failed and refused to pay Tec-Cast invoices totaling $339,095 as of the date of this complaint.

83. Sharrow Marine's failure to render payment constitutes a breach of contract, and Tec-Cast is entitled to a judgment against Sharrow Marine for its damages, and pre-judgment interest at 12 percent per year from the date of breach and continuing.

WHEREFORE, **p**laintiff demands judgment against Sharrow Marine for all amounts due under its invoices plus interest and costs.

### COUNT II--TEC-CAST  v.  SHARROW ENGINEERING  AND SHARROW
(Piercing the Corporate Veil)

84. The plaintiff restates it allegations to the previous paragraphs in the complaint.

85. Sharrow Marine is a wholly owned by Sharrow Engineering, and is wholly controlled by Sharrow, the majority beneficial owner and officer of both entities.

11

86. Sharrow Engineering and Sharrow Marine are involved in the same venture: producing and selling Sharrow propellers.

87. Sharrow is a majority shareholder in Sharrow Engineering.

88. Sharrow in the chief executive officer of both Sharrow Engineering and Sharrow Marine.

89. Sharrow exercises dominant and pervasive control over both Sharrow Engineering and Sharrow Marine.

90. Sharrow makes all operating decisions of both companies, hires and fires all management employees, makes strategic decisions, negotiates with suppliers and venders and generally runs both companies.

91. Sharrow uses the book value of Sharrow Engineering (pegged at $180,000,000 in 2025) to support Sharrow Marine which has a much lower value and is cash poor.

92. Sharrow disregarded the formal separation between Sharrow Engineering and Sharrow Marine to influence Morehardt and Tec-Cast to supply needed castings to Sharrow Marine while running up huge accounts payable delinquencies to Tec-Cast.

93. There is confused intermeddling between the two entities, Sharrow uses one to satisfy the obligations of the other, and vice-versa.

94. Sharrow repeatedly offered the payment guaranty of Sharrow Engineering of Sharrow Marine obligations to influence to solicit credit for payment to Tec-Cast, to obtain castings while carrying large accounts payable and to cause Tec-Cast to forbear from taking collection action against Sharrow Marine.

95. As with the factor agreement, employment agreement, stock compensation agreement, supplier agreement and promissory notes, Sharrow Engineering guaranties never materialized.

96. Sharrow repeatedly offered conversion rights in Sharrow Engineering stock to satisfy Sharrow Marine obligations and to influence Tec-Cast to provide castings while carrying large accounts payable balances, and to cause Tec-Cast to forbear from taking collection action against Sharrow Marine.

97. As with the conversion rights and Morehardt's stock compensation for employment, no stock in Sharrow Engineering ever materialized.

98. Sharrow disregarded the formal separation between Sharrow Marine and Sharrow Engineering for the injurious purpose of obtaining castings while running up large accounts payable to Tec-Cast for which payment was never made.

99. Based on Morehardt's knowledge of Sharrow Marine, from working on-site and having to use his own credit card for necessary tools and materials, his familiarity with Sharrow Marine's finances, and based on information and belief, it is apparent that Sharrow Marine is insolvent, and as evidenced by its failure to pay, or commit to resolve those obligations through only its own assets, is unable to pay its debts due and owing to Tec-Cast.

100.    Sharrow exercises pervasive control over both Sharrow Marine and Sharrow Engineering, and uses Sharrow Marine to run up debt that he intends not to pay, while operating the asset-rich Sharrow Engineering without those obligations.

101.    There is confused intermeddling of activity between Sharrow Marine and Sharrow Engineering, with substantial disregard of the separate nature of the corporate entities.

102.    Through the common ownership of the entities, and the personal participation of Sharrow himself in directing their activities for his personal benefit, there is an agency relationship between Sharrow Marine and Sharrow Engineering, based on the acts and

conduct of those entities and Sharrow, himself, is therefore liable for Tec-Cast's claims against Sharrow Marine.

103.     Based on the foregoing Sharrow Marine has inadequate capitalization, it was and has been insolvent at the time it ordered and accepted castings from Tec-Cast, the officers and directors of Sharrow Marine are not functioning for its benefit, and Sharrow and Sharrow Engineering are  using Sharrow Marine to cause injury against Tec-Cast.

104.     Leaving Tec-Cast to collect from the insolvent Sharrow Marine would be a gross inequity.

**WHEREFORE,** plaintiff demands judgment against Sharrow Engineering and Sharrow for all amounts due under its invoices to Sharrow Marine plus prejudgment interest from the date breach, and its costs.

## COUNT III--TEC-CAST, LLC  v.  SHARROW ENGINEERING & SHARROW
(Value of the Vested Stock)

105.     The plaintiff restates it allegations to the previous paragraphs in the complaint.

106.     Morehardt's compensation under his proposed employment contract was stock in Sharrow Engineering totaling 2% of the company vesting with the passage of time and the happening of certain events over 3 years.

107.     The agreed contract provided for a vesting of 25% of one-percent of the stock upon signing because Morehardt had already worked at Sharrow Marine for a year by the time the contract was negotiated and ready for signing.

108.     In addition, by December, 2025 when Morehardt was fired, two months of employment from the start date of the contract, November 1, 2025, had been performed by Morehardt and Morehardt had accomplished certain other tasks which resulted in vesting under the contract.

109.    As of Morehardt's firing, 40.6% of one-percent of the stock in Sharrow Engineering had vested under the terms of the stock compensation agreement.

110.    Sharrow Engineering had a value according to the company of $180,000,000 at the time of the vesting.

111.    Accordingly, Morehardt, as of his firing in December 2025, was already vested in stock with a value of $730,800 for the Director of Manufacturing  services he had performed for Sharrow Engineering without any compensation.

112.    In addition, Morehardt's proposed contract provided for a salary of $36,000 plus fringe benefits.

113.    Because Morehardt was a paid consultant for Tec-Cast at the time he provided stock vesting services for Sharrow Marine with promises and detrimental reliance, but without a signed contract, Morehardt's claims for the value of the stock he earned are owned to plaintiff Tec-Cast, LLC.

114.    Sharrow promised Morehardt payment for his services in payment of money and in granting stock ownership of Sharrow Engineering, and Morehardt, as agent for Tec-Cast, relied on Sharrow's assurances providing services, to his detriment, justifying the court to enforce their quasi-contract, implied agreement, express oral agreement, and/or enforcing liability against Defendants under promissory estoppel.

115.    In the alternative, Sharrow and Sharrow Engineering are liable to Tec-Cast for deceit, negligent and/or intentional representation, and/or fraud in the inducement, by falsely stating their agreement to adequately compensate Tec-Cast for Morehardt's services, and then

15

refusing to make good on their agreement, and falsely concocting grounds to attempt to avoid their obligations.

WHEREFORE**,** plaintiff demands judgment against Sharrow Engineering and Sharrow for the value of the stock compensation due for Morehardt's services, $730,800 plus interest and costs.

## COUNT IV--TEC-CAST, LLC  v.  SHARROW ENGINEERING, SHARROW MARINE AND SHARROW
(Value of Morehardt's Services)

116.     The plaintiff restates it allegations to the previous paragraphs in the complaint.

117.     In an August 13, 2025 stock compensation proposal written for Sharrow Engineering, Morehardt's services for one year were valued at $570,000.

118.     Because Morehardt was a paid consultant for Tec-Cast at the time he provided Director of Manufacturing services for Sharrow Marine without a signed contract, Morehardt's claims for fair compensation are owned by Tec-Cast, LLC

**WHEREFORE,** plaintiff demands judgment against Sharrow Engineering and Sharrow Marine for the value of Morehardt's services, plus interest and costs.

## COUNT V—TEC-CAST V. SHARROW AND SHARROW ENGINEERING
(Tortious Interference with Contract and/or Advantageous Business Relations)

119.     The plaintiff restates it allegations to the previous paragraphs in the complaint.

120.     There existed a contractual relationship to sell castings between Tec-Cast and Sharrow Marine.

121.     By virtue of the acts and conduct of Sharrow, Individually and as Agent on behalf of Sharrow Engineering, intentionally, and by the use of improper motive or unlawful means, tortuously interfered with the existing contract between Tec-Cast and Sharrow Marine,

16

causing it to repudiate on agreements to satisfy its indebtedness, to provide security, and to obligate Sharrow and Sharrow Marine to pay its indebtedness should it not do so.

122.     Further, Sharrow and Sharrow Engineering intentionally interfered with advantageous business relations between Tec-Cast and Sharrow Marine, causing Tec-Cast not to be paid for delivered orders and to lose future orders.

**WHEREFORE**, plaintiff demands judgment against Sharrow and Sharrow Engineering for all damages, plus interest and costs.

## COUNT VI—TEC-CAST V. GREGORY SHARROW
(Fraudulent Misrepresentation)

123.     The plaintiff restates it allegations to the previous paragraphs in the complaint.

124.     As alleged in detail in this complaint, the defendant Gregory Sharrow made false representations of material fact to Tec-Cast concerning Sharrow Marine's and Sharrow Engineering's and his intention to provide security for and pay Tec-Cast for castings and his intention to compensate Tec-Cast with Sharrow Engineering stock for Morehardt's services.

125.     Gregory Sharrow made these statements with knowledge of their falsity for the purpose of inducing Tec-Cast to refrain from collection activities and to continue to supply castings to Marine, and to induce Morehardt to provide valuable services to Sharrow, Sharrow Engineering and Sharrow Marine.

126.     Tec-Cast relied on these promises to its detriment and did act on the false promises and suffered damages as a result. .

**WHEREFORE**, plaintiff demands judgment against Gregory Sharrow for all damages, plus interest and costs.

JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury on all claims and issues so triable.

Dated: June 5, 2026                         TEC-CAST, LLC, Plaintiff

By its attorneys,

*/s/ Bart Heemskerk*
Bart Heemskerk (BBO# 548058)
Heemskerk Business Litigation PLLC
PO Box 80298
Springfield, MA 01138
Tel. 413-896-4598
bart@heemskerklawyer.com

*/s/ John B. Stewart*
John B. Stewart (BBO#551180)
John B. Stewart, PC
93 Van Deene Ave., Ste. 103
West Springfield, MA 01089
Tel. 413-206-9134
thetrialer@aim.com

CERTIFICATE OF SERVICE

I certify that a true copy of the within document was filed through the ECF system and will be sent electronically to the registered participants as identified on the notice of electronic filing and paper copies will be sent to those indicated as non-registered participants on June 5, 2026.

/s/ John  B. Stewart
JOHN B. STEWART